UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Mohamud Hussein Ahmed, | Case No. 20-cv-815-DSD-KMM |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Guy Bosch, *Warden*, | |
| Respondent. | |

This matter is before the Court on Mohamud Hussein Ahmed's Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody. Pet., ECF No. 1. Mr. Ahmed asserts that: there was insufficient evidence to support his conviction; the trial court's admission of a witness's out-of-court statement violated his rights under the Confrontation Clause of the Sixth Amendment; and an upward departure from the Minnesota Sentencing Guidelines range "exaggerated the criminality of his conduct." *Id.* For the reasons that follow, the Court recommends that the Petition be denied and this case be dismissed.

**I.     Background**

Mr. Ahmed was watching his infant child, N.H., during the afternoon of August 24, 2015. *State v. Ahmed*, No. A18-0977, 2019 WL 1430689, at *1 (Minn. App. Apr. 1, 2019). When N.H.'s mother, H.Y., came home and discovered that N.H. "was abnormally fussy and unwilling to take a bottle or nurse," she and Mr. Ahmed took N.H. to the emergency room. *Id.* Although doctors wanted to perform a CT scan and other tests, Mr. Ahmed left with N.H. against medical advice. *Id.*

Mr. Ahmed and H.Y. watched N.H. until the early morning hours, but when Mr. Ahmed fell asleep, H.Y. became concerned about N.H.'s condition, called 911, and went with

1

emergency personnel back to the hospital. *Id.* "N.H. was moaning, moving spontaneously, and unresponsive to stimuli" and tests showed injuries to his brain. *Id.* H.Y. told hospital personnel that N.H. "had recently tipped over in his car seat while she was driving but had not appeared injured." *Id.* After N.H. was airlifted to another hospital, subsequent testing revealed significant injuries, including brain swelling, fractured left collarbone, recent rib fractures, bleeding in the lungs, brain bleeding in multiple areas, and retinal hemorrhages in both eyes. *Id.* "Medical personnel recognized that these injuries suggest non-accidental trauma, such as smothering or shaking and squeezing very hard." *Id.* (quotations and alterations omitted). The rib fracturing was "highly indicative of abuse." *Id.*

On August 25th, police and child-protection services interviewed Mr. Ahmed at his home. *Id.* Mr. Ahmed stated that N.H. "had been injured when his car seat tipped over while mother was driving." *Id.* at *2. However, after Mr. Ahmed received a call during the interview and had a conversation in Somali, he suggested to the officers that N.H. must have become injured "when the child fell while in the shower with mother." *Id.* While Mr. Ahmed was being interviewed, H.Y. gave a statement to detectives at the Rochester hospital to which N.H. had been airlifted. She told the officers that N.H. must have tipped over in his car seat. *Id.* During a break in her interview, she made a phone call, which detectives learned was the call Mr. Ahmed received during his interview. *Id.* After the call, H.Y. resumed her conversation with the officers in Rochester. At that point, she said that N.H.'s injuries occurred during a fall in the shower. *Id.* The detectives seized her phone at the end of the interview. *Id.*

The conversation Mr. Ahmed and H.Y. had during the interview had been recorded and was later translated from Somali to English. *Id.* The translation showed that Mr. Ahmed "directed [H.Y.] to say that she dropped N.H. in the shower then drove him around and his car

2

seat tipped over, and she agreed to do as he asked." *Id.* Several days later, H.Y. became remorseful and told one of the detectives who had interviewed her that she had lied about what caused N.H.'s injuries. During that conversation, she said she was afraid of Mr. Ahmed. *Id.*

In late September 2015, Mr. Ahmed provided another statement to police, again stating that the N.H.'s injuries occurred from tipping over in his car seat and a fall in the shower. *Id.* However, "he indicated that he, not [H.Y.], was the one driving and the one who dropped the child in the shower." *Id.*

### *Trial*

Later that month, Mr. Ahmed was charged in Blue Earth County District Court by a five-count complaint concerning injuries to his infant son. The State filed an Amended Complaint charging him with three counts: (1) Malicious Punishment of a Child – Great Bodily Harm in violation of Minn. Stat. § 609.377.6; (2) Malicious Punishment – Substantial Bodily Harm in violation of Minn. Stat. § 609.377.5; and (3) Malicious Punishment – Child Under Four Years in violation of Minn. Stat. § 609.377.4. ECF No. 8-4 at 3.

The Blue Earth County District Court held a jury trial over five days in late October and early November 2017. *Id.* at 4. During the trial, "medical experts agreed that N.H.'s injuries indicated non-accidental trauma, could not have been caused by a car seat tipping over or a fall in the shower, and have left N.H. 'profoundly impaired.'" *Ahmed*, 2019 WL 1430689, at *2. The jury found Mr. Ahmed guilty on all three counts, and he was sentenced to 201 months in prison, "an upward departure based on [the child's] particular vulnerability." *Ahmed*, 2019 WL 1430689, at *2. The jury returned a special verdict, finding that the child, N.H., "was unable to fight back, flee, or seek help because of his age; Ahmed knew or should have known N.H. was

3

vulnerable due to his age; and Ahmed knew or should have known N.H. would be unable to communicate what happened to him due to his age and mental capacity." *Id.* at 2 n.2.

### *Direct Appeal*

Mr. Ahmed challenged his conviction and sentence in the Minnesota Court of Appeals. *Id.* at *3–5. He raised three issues during his appeal. First, he argued that the evidence was insufficient to support his conviction. *Id.* at *3. The court of appeals noted that Minnesota case law required it to view the evidence in the light most favorable to the guilty verdict, resolve all questions of fact in favor of the verdict, and consider the reasonable inferences to be drawn from the circumstantial evidence. *Id.* Looking at the evidence in the record, the court rejected Mr. Ahmed's insufficiency-of-the-evidence claim because the circumstances supported "only one rational hypothesis—Ahmed was the person who intentionally inflicted the harm upon N.H." *Id.*

Second, Mr. Ahmed argued that the trial court violated his rights under the Confrontation Clause by admitting the second statement that H.Y. made to police. *Id.* at *3–4. Because he did not object to the introduction of the statement at trial, the court of appeals reviewed the issue for plain error. *Id.* at *4. The State conceded that: the statement was testimonial; and Mr. Ahmed did not have a chance to cross examine N.H.'s mother. *Id.* However, the court of appeals accepted the State's argument that Mr. Ahmed may have forfeited his right of confrontation because "the record suggests [he] may have interfered with [H.Y.]," based on the State's assertion in the district court that he "had apparently been in contact with [her] despite a no-contact order and had another child with her in summer 2017." *Id.* at *4 & n.3. The court of appeals also reasoned that Mr. Ahmed may have had "tactical reasons for not objecting," including: possibly viewing H.Y's statements "collectively as exculpatory"; believing it was "not worth an objection"

4

because portions of the statement were duplicative of other admissible evidence; and "avoid[ing] an inquiry into why she was unavailable." *Id.* at *4. Lastly, the court of appeals concluded that Mr. Ahmed failed to show prejudice from admission of the statement such that it affected his substantial rights because the statement was cumulative of other evidence that thoroughly established Mr. Ahmed's guilt. *Id.*

Finally, Mr. Ahmed argued that the upward departure based on the aggravating factor of N.H.'s vulnerability exaggerated the criminality of his conduct. *Id.* at *5. The court of appeals rejected this claim, noting that the sentence was a "substantial but not quite double upward departure from the 103-month maximum presumptive sentence for first-degree assault." *Id.* The court further observed that Mr. Ahmed did not cite any authority supporting the argument that the 201-month sentence "exaggerate[d] the criminality of his assault," and indicated that other Minnesota cases had resulted in similar upward departures in cases involving first-degree assaults of particularly vulnerable infants. *Id.*

Mr. Ahmed petitioned for review from the Minnesota Supreme Court, raising the same three issues he argued at the court of appeals.[1] The Minnesota Supreme Court denied review on May 28, 2019.[2] Mr. Ahmed filed his habeas petition on March 26, 2020, again raising the same three issues he raised to the Minnesota Court of Appeals.

---

[1]   *State v. Ahmed*, No. A18-0977 (Minn. Apr. 10, 2019) (Petition for Review), https://macsnc.courts.state.mn.us/ctrack/docket/docketEntry.do?action=edit&deID= 1030298&csNameID=88795&csInstanceID=106160&csIID=106160.

[2]   *State v. Ahmed*, No. A18-0977 (Minn. May 28, 2019) (Order denying Petition for Review), https://macsnc.courts.state.mn.us/ctrack/docket/docketEntry.do?action=edit&deID= 1037717&csNameID=88795&csInstanceID=106160&csIID=106160.

**II.     Legal Standard**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the standard for reviewing claims raised by an individual in custody pursuant to a state court judgment. Under 28 U.S.C. § 2254(d),

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), a state-court decision is "contrary to" Supreme Court precedent if it reaches the opposite conclusion from the Court on a legal question, or if the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under § 2254(d)(2)'s "unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Shelton v. Mapes*, 821 F.3d 941 (8th Cir. 2016) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). Under this standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of

6

the state court court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted).

## III. Analysis

Mr. Ahmed raises three claims in his habeas petition. First, he argues that the evidence was insufficient to support his conviction. Second, he alleges that admitting H.Y.'s second statement to police during his trial violated his Sixth Amendment right of confrontation. And third, he claims that the trial court's upward departure exaggerated the criminality of his conduct. For the reasons that follow, the Court concludes that Mr. Ahmed is not entitled to habeas relief.

### A. Insufficient Evidence

"[A] challenge to the sufficiency of the evidence to convict in a state prosecution is necessarily a due process challenge to the conviction." *Satter v. Leapley*, 977 F.2d 1259, 1262 (8th Cir. 1992). The Supreme Court has held that "evidence is sufficient to support a conviction whenever, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Id.* (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011)). This standard is heavily deferential to the state-court's ruling because the state court must defer to the jury's verdict when an insufficiency-of-the-evidence claim is made during a direct appeal and the habeas court must likewise defer to the state court's resolution of such a claim in a proceeding under § 2254. *Id.* (describing the standard as "twice-deferential").

In his Petition, Mr. Ahmed argues that he is entitled to habeas relief because the State failed to prove that he "intentionally inflicted great bodily harm" upon N.H. and that he

7

"committed an intentional act or set of acts against [his] child that caused great bodily harm." Pet. at 5. He asserts that no witness testified to "seeing the child's injuries occur in a manner that could have 'intentionally' produce[d] the injures." Pet'r Mem. at 10–11, ECF No. 9. Finally, he characterizes the evidence presented at trial as supporting mere "educated guesses" about what could have happened to N.H. *Id.* at 11.

Mr. Ahmed's attacks on the strength of the State's case do not establish that the court of appeals' rejection of his sufficiency-of-the-evidence claim was objectively unreasonable. Indeed, the court of appeals properly viewed the evidence in the light most favorable to the prosecution, and under the "twice deferential" lens applicable on habeas review, it is apparent that a rational trier of fact could have found him guilty beyond a reasonable doubt.

Mr. Ahmed's claim appears to focus on the inferences drawn from the evidence to conclude that he intentionally caused N.H.'s injuries. Under Minnesota law, intent was an element of the first-degree assault and malicious-punishment charges of which Mr. Ahmed was found guilty. Minn. Stat. § 609.377, subd. 1; Minn. Stat. § 609.377, subds. 1, 6. The court of appeals acknowledged that the State's case was based on circumstantial evidence of Mr. Ahmed's intent, but concluded that only one rational hypothesis could be drawn from the circumstances demonstrated by the evidence. *Ahmed*, 2019 WL 1430689, at *3. Based on the evidence provided at trial, such a conclusion was not objectively unreasonable.

The evidence showed that on August 24, 2015, when H.Y. left N.H. in Mr. Ahmed's care, N.H. was healthy. N.H. was in no other person's care until H.Y. returned home, at which point she noticed that the child was abnormally fussy and would not feed. After taking N.H. to the hospital and discovering that emergency room doctors wanted to perform a CT scan, Mr. Ahmed and H.Y. left the hospital with N.H. and returned home. After Mr. Ahmed fell asleep

in the early morning hours of August 25th, H.Y. brought the child back to the hospital and he was airlifted to a hospital in Rochester. These facts could allow a rational juror to infer that N.H. had suffered his injuries while in Mr. Ahmed's care and that Mr. Ahmed left the hospital before the CT scan could be performed because he was concerned about what the test might show.

At trial, testimony showed that there were conflicting stories from both Mr. Ahmed and H.Y. during the investigation about how N.H. sustained his injuries. Mr. Ahmed originally told law enforcement that N.H. was injured when he tipped over in his car seat while H.Y. was driving the vehicle. Tr. 204–05.[3] Police did not believe this story based on the extent of N.H.'s injuries, and pressed Mr. Ahmed on his statements' inconsistency with the evidence. *Id.* at 205–07. However, Mr. Ahmed spoke on the phone with H.Y. during the interview, instructed H.Y. to tell the officers who were simultaneously interviewing her at the hospital in Rochester that N.H. had been injured from a time that H.Y. dropped N.H. in the shower, and she agreed to change her story. *Id.* at 269, 270, 378–79, 437–38. Text messages on H.Y.'s phone also indicated that Mr. Ahmed instructed H.Y. to tell officers that N.H. had been born with a big head in response to doctors' concerns that he had exhibited swelling in the head. Tr. 222–28.

Later, Mr. Ahmed told investigators a slightly different version of events. Tr. 411–14. He explained that N.H. had been injured from tipping over in his car seat while he was driving and that he, not H.Y., had dropped N.H. in the shower. *Id.* Medical experts testified at trial that N.H.'s brain injuries could not likely have been caused from having tipped over in his car seat or being dropped in the shower; his rib fractures were caused by a great deal of force; and the overall injuries pointed to child abuse. Tr. 563–65, 595–99, 664–75.

---

[3]   Portions of the trial transcript are included at ECF 8-3 and ECF 13. The Court cites the transcript page numbers as follows: "Tr. __".

It was not objectively unreasonable for the court of appeals to conclude that evidence such as this would allow a reasonable juror to draw the inference that Mr. Ahmed intentionally caused N.H.'s injuries. The fact that Mr. Ahmed initially told investigators that N.H. had been injured accidentally in one manner and later told them the child was involved in a different accident is consistent with the hypothesis that he was not telling the truth. Similarly, the communications in which he instructed H.Y. to change her own story to match his shifting narrative would allow a rational jury to conclude that Mr. Ahmed was attempting to mislead investigators, suggesting that the child was injured in a non-accidental way. It was not objectively unreasonable for the Minnesota Court of Appeals to conclude that this evidence was sufficient to support the jury's conclusion that Mr. Ahmed had intentionally harmed the child.

In his reply memorandum, Mr. Ahmed provides a lengthy description of the testimony elicited at trial from several witnesses. Even if that evidence could support a conflicting hypothesis regarding the cause of N.H.'s injuries, in a habeas corpus proceeding, this Court must give great deference to the state court's determination and take all inferences from the evidence in the prosecution's favor. Applying that considerably deferential standard for habeas review of a challenge to the sufficiency of the evidence, the Court concludes that the decision of the Minnesota Court of Appeals is not objectively unreasonable.

### B. Confrontation Clause

Mr. Ahmed argues that the admission at trial of H.Y.'s second statement to the police violated his Sixth Amendment rights. Generally, evidentiary rulings in state court trials do not present claims that are cognizable in habeas corpus proceedings under § 2254. *See, e.g.*, *Bounds v. Delo*, 151 F.3d 1116, 1119 (8th Cir. 1998). However, habeas relief may be available when an "evidentiary ruling infringes upon a specific constitutional protection or is so prejudicial that it

amounts to a denial of due process." *Turner v. Armontrout*, 845 F.2d 165, 169 (8th Cir. 1988). The Confrontation Clause protects the right of a criminal defendant to confront and cross-examine witnesses who testify against him. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 50–52 (2004). The admission of "testimonial" statements of witnesses implicates the Confrontation Clause. *Id.* Thus, admission of testimonial, out-of-court statements without giving the defendant an opportunity to cross-examine the witness is an evidentiary ruling that is reviewable in a habeas case.

Here, the State conceded that H.Y.'s second statement to police was testimonial and that Mr. Ahmed did not have a chance to cross-examine her at trial. *Ahmed*, 2019 WL 1430689, at *3–4. But because Mr. Ahmed did not object to the admission of the statement, the Minnesota Court of Appeals evaluated his Confrontation Clause claim under a plain error standard and determined that admission of the statement did not require reversal. *Id.* at *4.[4]

The court of appeals suggested three reasons why Mr. Ahmed's Sixth Amendment claim might not require reversal of his conviction: (1) he may have interfered with the availability of the witness; (2) there were possible strategic reasons for his decision not to object to the evidence; and (3) H.Y's statement was cumulative of other evidence that supported the jury's

---

[4] There is a split within the Eighth Circuit concerning claims reviewed under the plain-error standard in state appellate courts. *See Shelton v. Purkett*, 563 F.3d 404, 408 (8th Cir. 2009) (recognizing the "surprisingly persistent" intra-circuit split); *Toua Hong Chang v. Minnesota*, 521 F.3d 828, 832 n.3 (8th Cir. 2008) (same). Some cases suggest that when a petitioner fails to raise an objection before the trial court and the state appellate court conducts only a plain-error review, such a claim is procedurally defaulted and cannot be reviewed in a later habeas proceeding. *See Vann v. Smith*, No. 13-cv-893 (SRN/JSM), 2015 WL 520565, at *32 n.11 (D. Minn. Feb. 8, 2015) (citing *Toney v. Gammon*, 79 F.3d 693, 699 (8th Cir. 1996), and other cases). Others have either concluded, or assumed without deciding, that issues reviewed on direct appeal for only plain error are subject to consideration in a habeas proceeding in federal court. *Id.* (citing *Thomas v. Bowersox*, 208 F.3d 699, 701 (8th Cir. 2000)). The Respondent has not alleged that the Confrontation Clause issue is procedurally defaulted, and the Court will consider the merits of Mr. Ahmed's claim.

verdict, and therefore did not affect Mr. Ahmed's substantial rights. *Id.* However, the court relied only on the third of these reasons in its plain-error analysis of Mr. Ahmed's Confrontation Clause claim. Indeed, the court of appeals merely noted that "forfeiture [of the confrontation right] *may be implicated*" by the suggestion in the record that Mr. Ahmed "*may have interfered* with [H.Y.]." *Ahmed*, 2019 WL 1430689, at *4 (emphasis added). And it observed only that "Ahmed *may have had tactical reasons* for not objecting" that the district court could have "disrupted" if it "intervened to exclude the statement sua sponte…." *Id.* (emphasis added). By contrast, the court of appeals' conclusion that Mr. Ahmed's substantial rights were not affected by admission of the statement because it was cumulative of other evidence was not so equivocal. *Id.* ("[The cumulative evidence], together with testimony as to Ahmed's own actions and the timing of the child's non-accidental injuries, so thoroughly established Ahmed's guilt that the verdict was surely unattributable to the admission of mother's second statement.").

In reviewing the state court's conclusion that H.Y.'s statement was cumulative of other evidence, this Court is mindful that it "may not simply conduct [its] own plain error review de novo" because "AEDPA mandates a deferential review of a state court decision[.]" *Shelton*, 563 F.3d at 408. That deferential review is exemplified in *Toua Hong Chang*, where the Eighth Circuit considered a Confrontation Clause challenge to the admission of out-of-court statements during a sexual assault prosecution. 521 F.3d at 831–33. At trial, the petitioner did not object to testimony about out-of-court statements made by one of the victims. The petitioner nevertheless raised a confrontation claim to the Minnesota Court of Appeals, which reviewed the issue for plain error, and denied relief. *Id.* at 830–31. The petitioner then sought habeas review in federal district court, which denied his petition. On appeal, the Eighth Circuit explained that

> even if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, [the] analysis is not complete.

12

> Specifically, [the habeas court] must apply *Brecht*'s harmless-error analysis unless the error was a structural defect in the trial that defies harmless-error analysis. *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993). Under *Brecht*, habeas relief is proper only if the error had a substantial and injurious effect or influence in determining the jury's verdict.

521 F.3d at 832. Relief is only possible if the habeas court has a "grave doubt about the effect of the error on the jury's verdict … [which occurs] where the issue of harmlessness is so evenly balanced that the court feels itself in virtual equipoise as to the harmlessness of the error." *Id.* (cleaned up). Thus, the habeas court is "not required to conduct a formal application of both the [AEDPA] and *Brecht* because the *Brecht* analysis obviously subsumes the AEDPA test." *Id.* (cleaned up).[5]

Under *Brecht*, several factors guide a habeas court's consideration of this harmless-error analysis, including:

> (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.

*Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Here, as conceded by the State, H.Y.'s second statement was admitted even though it was testimonial and Mr. Ahmed did not have an opportunity to cross-examine H.Y. Admission of this statement was, therefore, inconsistent with the Confrontation Clause. However, the Court ultimately concludes that admission of the statement "did not rise to the level of *Brecht* error,"

---

[5]   On October 5, 2021, the United States Supreme Court heard argument in *Brown v. Davenport*, No. 20-826. In *Brown*, the issue is whether a federal habeas court may grant relief based solely on its conclusion that the test from *Brecht* is satisfied, or whether the court must also find that the state court's application of *Chapman v. California*, 386 U.S. 18 (1967), was unreasonable under 28 U.S.C. § 2254(d)(1).
https://www.supremecourt.gov/docket/docketfiles/html/public/20-826.html.

*Toua Hong Chang*, 521 F.3d at 833, largely for the reason identified by the Minnesota Court of Appeals—it was cumulative of other evidence that supported the jury's guilty verdict. In light of the record, the Court does not have a grave doubt about the effect that the erroneous admission of H.Y.'s second statement had on the jury's verdict.

The evidence at trial regarding H.Y.'s challenged statement was admitted through the testimony of Officer Bennett, who spoke to H.Y. on August 29, 2015. Officer Bennett testified that H.Y. reached out to law enforcement several days after N.H.'s injuries occurred, saying that she wanted to give another statement. Tr. 212–13. H.Y. came into the station and told the detectives that she did not observe what happened to N.H. on August 24th. H.Y. stated that around 2:00 p.m., Mr. Ahmed dropped her off at a residence in Mankato so she could have "ornamental ink" (Henna) applied. This process took about four hours. She said that Mr. Ahmed watched N.H. during that time. After she came home and saw that N.H. was behaving abnormally, she asked Mr. Ahmed what happened to the child. According to H.Y., Mr. Ahmed claimed N.H. had tipped over when Mr. Ahmed was driving.

Further, Officer Bennett testified that H.Y. told the detectives that once she and Mr. Ahmed took N.H. to the hospital on August 24th, it was Mr. Ahmed's decision to leave and take N.H. back to their home. H.Y. told detectives that sometime after they returned home with N.H. and spent time praying for the child together, she and Mr. Ahmed discussed taking N.H. back to the hospital, but he claimed that he was too tired to do so. She also told detectives that she had not injured N.H. and that she came forward because "you know that we are lying about this," and it made her feel sick. Officer Bennett testified that H.Y. said she wanted to tell the truth, that she had changed her earlier story about the cause of N.H.'s injuries because Mr. Ahmed instructed her on what to say, and that she was afraid of Mr. Ahmed. Because she

14

said she was afraid, she was relocated to a domestic abuse shelter in Mankato. Tr. 213–18, 229–30, 254.

The Court concludes that, under the *Brecht* test, the state court's determination that the error was harmless because the evidence was cumulative was not unreasonable. Careful review of the record demonstrates that two aspects of Officer Bennet's testimony regarding H.Y.'s second statement to police were not corroborated by or cumulative of other evidence. First is Officer Bennett's testimony that H.Y. told him she was afraid of Mr. Ahmed. The Respondent points to no other evidence in the record of which this statement was cumulative. Indeed, the Respondent glosses over this portion of the erroneously admitted statement entirely. And second, although other evidence suggested that Mr. Ahmed told officers that he simply fell asleep after the couple initially brought N.H. home from the hospital, Officer Bennet testified that H.Y. said the couple spoke about bringing N.H. back to the hospital when his condition did not improve, and Mr. Ahmed declined to go because he was too tired. Testimony regarding these two matters was certainly unfavorable to Mr. Ahmed. A reasonable juror hearing H.Y.'s out-of-court statements could conclude that Mr. Ahmed was more likely to have intentionally harmed N.H. if he inspired fear in his own wife. Such a juror could also draw unfavorable inferences about Mr. Ahmed's intent if the juror believed that he callously refused to bring his injured infant child back to the hospital because he was too tired.

Despite these concerning aspects of the record, the Court is not convinced that the jury might have reached a different verdict if Officer Bennett's testimony had not been introduced by the State. Aside from the two points highlighted above, most of H.Y.'s statement duplicated other evidence admitted at trial, and that evidence was consistent with the jury's verdict. The jury heard that Mr. Ahmed and his attorneys met with investigators, and during that interview he

15

told them a story that largely corroborated the details H.Y. provided in her second interview. During Mr. Ahmed's meeting with police, he said that on August 24th, he dropped H.Y. off at a Mankato residence to receive a Henna design. Mr. Ahmed told police that on his drive home, the car was shaking due to road construction and the car seat holding N.H. tipped over or it was on its side. Mr. Ahmed stated that N.H. went to sleep after he got home, but when he heard N.H. crying, he took N.H. into a shower and then accidentally dropped him. Tr. 411–13. Mr. Ahmed also told investigators that it was his decision to leave the hospital with N.H. after they made their first visit to the emergency room. He told investigators that once they were back home, he and his wife "read the Koran … until about 2:30 … in the morning," and then he fell asleep. Tr. 413–14. The jury heard other evidence indicating that Mr. Ahmed instructed H.Y. on what to tell investigators had happened to N.H. Specifically, another officer testified regarding the recording of the cell phone conversation Mr. Ahmed had with H.Y. on August 25th, when they were both being interviewed by police. During that call, Mr. Ahmed told H.Y. to tell the police who were interviewing her at the hospital in Rochester that she had dropped N.H. in the shower. Tr. 437–38.

Therefore, both the challenged statement and other evidence showed that: Mr. Ahmed was the only person watching N.H. during the period when the child's injuries likely occurred; he gave conflicting accounts over time about how N.H. became injured; he coached H.Y. to give different accounts to the police about how N.H. was hurt and to implicate herself in causing the harm; and it was his decision to take N.H. back home from the hospital on the night of August 24th (before a CT scan could be performed).

Other factors relevant to the *Brecht* analysis also support a conclusion that the Minnesota Court of Appeals properly rejected Mr. Ahmed's confrontation claim. Having reviewed the trial

16

transcript, the Court is satisfied that Mr. Ahmed was not deprived of other meaningful opportunities for cross examination, and the State's case against Mr. Ahmed was otherwise strong. In particular, the Court notes that the State introduced significant medical evidence about the likely cause of N.H.'s injuries and Mr. Ahmed was given substantial opportunities to challenge that evidence through cross-examination. That evidence strongly suggested that N.H.'s injuries were not accidental, but most likely resulted from abuse. The same evidence undermined each of the accidental explanations Mr. Ahmed provided about how N.H. came to be injured. These details, combined with the window of time when N.H. likely suffered his injuries, pointed to Mr. Ahmed as the likely perpetrator of the abuse and was consistent with the jury's guilty verdict.

Finally, although there is one concerning aspect about the State's closing argument, the challenged testimony regarding H.Y.'s second statement was not the chief focus of the prosecution. The Court's concern arises from the prosecutor's reference to testimony that Mr. Ahmed refused to take N.H. back to the hospital with H.Y. after the couple returned home with the child. The prosecutor argued that this evidence showed that Mr. Ahmed was trying to "hide his action" from law enforcement.[6] Because the evidence that Mr. Ahmed and H.Y. discussed going back to the hospital and he was against doing so because he was too tired only came in through the erroneously admitted testimony about H.Y.'s second statement to police, it cannot be disputed that the State used the improper evidence as one building block in its case. But other evidence, including Mr. Ahmed's own text messages to H.Y., his choice to leave the hospital after the couple first took N.H. in for examination, and the shifting narrative he provided

---

6   Tr. 791.

all similarly pointed to an inference that he was attempting to hide from investigators what truly happened to the child.

Aside from that issue, a review of the closing reveals that the State neither built its case around, nor heavily relied upon Officer Bennett's testimony about H.Y.'s statements to the police. Although the prosecutor referenced the fact that Mr. Ahmed told H.Y. what to say about how N.H. was injured, this was not accomplished by any direct reference to H.Y.'s statements, and evidence that Mr. Ahmed coached H.Y. came in through other sources. Perhaps most importantly, the prosecutor did not make any reference at all to H.Y.'s statement that she was afraid of Mr. Ahmed and was taken to a domestic abuse center following their second interview. Thus, the Court does not conclude that the erroneously admitted testimony was of great significance to the State's case.

Based on the foregoing, the Court finds that the error in admitting H.Y.'s out-of-court statements without providing Mr. Ahmed an opportunity for cross-examination did not have a substantial and injurious effect or influence in determining the jury's verdict.

### C. Upward Departure

In his third and final claim, Mr. Ahmed asserts that the trial court erred in imposing a longer sentence than that suggested by the State of Minnesota's presumptive sentencing guidelines range. His sentence was longer because the jury determined that N.H. was a particularly vulnerable victim.

Under the AEDPA, federal habeas courts cannot issue a writ of habeas corpus based upon errors in state law—rather relief can only be provided where the state court's decision is contrary to, or involved an unreasonable application of, federal law or the U.S. Constitution. 28 U.S.C. § 2254(d). To raise a constitutional claim during his state proceedings, Mr. Ahmed needed to

18

refer "to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir.1997).

In his direct appeal, however, Mr. Ahmed did not raise this sentencing claim as one based upon a federal constitutional right. Both in his direct appeal and in this proceeding Mr. Ahmed raised the argument that the district court abused its discretion in imposing his sentence only by reference to Minnesota cases raising issues of state law. *See* ECF 8-4 at 21–24; *see also* Pet. at 8 (stating only that the sentence exaggerated the criminality of petitioner's conduct); Pet'r Mem. at 15 (same). Under these circumstances, Mr. Ahmed has not raised a cognizable habeas claim. *Cindrich v. Minnesota*, No. 09-cv-2296 (PJS/JJK), 2010 WL 2301530, at *4 (D. Minn. Feb. 23, 2010) (concluding that the portion of the petition claiming that the trial court erroneously determined there were aggravating factors justifying an upward durational departure did not "raise any issue of federal law or any constitutional grounds and, thus, is not cognizable in federal habeas"), *report and recommendation adopted*, No. 09-cv-2296 (PJS/JJK), 2010 WL 2509929 (D. Minn. June 4, 2010). Accordingly, the Court concludes that Mr. Ahmed's petition should be denied to the extent he seeks a writ of habeas corpus based on the allegation that he was sentenced in violation of Minnesota law.

## IV.  Recommendation

Based on the foregoing, the Court recommends that the Petition [ECF No. 1] be **DENIED** and this case be **DISMISSED WITH PREJUDICE**.

Date: November 17, 2021

                                                *s/Katherine Menendez*
                                                Katherine Menendez
                                                United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.